## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

United States of America,

      Plaintiff,

v.

Demetrius Charles Edward Derden,

      Defendant.

**Criminal No. 12-12 (PJS/SER)**

**REPORT AND
RECOMMENDATION**

---

      Julie E. Allyn, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Plaintiff.

      Reynaldo A. Aligada, Jr., Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, Minnesota 55415, for Defendant.

---

STEVEN E. RAU, United States Magistrate Judge

      The above captioned case comes before the undersigned United States Magistrate Judge on Defendant Demetrius Charles Edward Derden's ("Derden") Motion to Suppress Fruits of Unlawful Arrest and Search and Seizure. [Doc. No. 17]. This matter has been referred for the resolution of pretrial matters pursuant to 28 U.S.C. § 636(b)(1)(A) and District of Minnesota Local Rule 72.1. The Court recommends that Derden's motion be denied.[1]

## I.      BACKGROUND

      The Government filed a one-count Indictment against Derden on January 12, 2012, charging him with Interference with Commerce by Robbery in violation of the Hobbs Act, 18 U.S.C. § 1951. [Doc. No. 1]. A pre-trial motions hearing was held on March 1, 2012. [Doc. Nos. 21, 24]. Sergeant Eric Kittelson ("Sergeant Kittelson"), Officer Mark Joseph Allen

---

[1]      The non-dispositive pretrial motions are addressed in a separate Order.

("Officer Allen"), Officer Nate Hatanpa ("Officer Hatanpa"), Detective Bill Hughes ("Detective Hughes"), and Detective Rian Thiele ("Detective Thiele") testified on behalf of the Government. Three exhibits were received into evidence: Government Exhibit 1–Search Warrant, Application, and Return for 76 99th Avenue Northeast, Blaine, Minnesota, 55434 ("Search Warrant 1"); Government Exhibit 2–Search Warrant, Application, and Return for DNA and photographs of Demetrius Charles Edward Derden ("Search Warrant 2"); and Government Exhibit 3–Amended Search Warrant, Application, and Return for 76 99th Avenue Northeast, Blaine, Minnesota, 55434 ("Search Warrant 3").

The parties filed simultaneous post-hearing briefs on March 13, 2012 and rebuttal briefs on March 19, 2012.  [Doc. Nos. 25, 26, 28].  The Court took the matter under advisement as of March 19, 2012.  This matter is set for trial before United States District Court Judge Patrick J. Schiltz.

## II.   FACTS

Derden was arrested in the early morning hours of December 4, 2011 while sleeping in the basement of Denise Kellerman's home at 76 99th Avenue Northeast, Blaine, Minnesota, 55434.  Derden paid the Kellermans rent.  The primary issue in this matter is whether Denise Kellerman's consent to law enforcement officers' entry and the subsequent arrest of Derden was effective in the absence of a warrant.  If the consent was not valid as to Derden, then any evidence gathered subsequent to the arrest may be suppressible as fruit of the poisonous tree.

### A.  The Robbery Investigation

On December 3, 2011, at approximately 8:46 p.m., Carver County Sheriff's patrol officers received a call alerting them of an armed robbery at Mayer Mobile, a gas station in

Mayer, Minnesota.  (Tr. 6, 7).[2]  Carver County police officer Sergeant James Clark ("Sergeant Clark") was one of the first officers to arrive on the scene.  (Tr. 6).  Approximately fifteen minutes after the call, Sergeant Clark contacted Sergeant Kittelson to request assistance in processing the crime scene.  (*Id.*).

Sergeant Kittelson conducted ten to twelve DNA swabs of what appeared to be blood, took photos, and collected other physical evidence.  (Tr. 7, 21–22).  While Sergeant Kittelson processed the scene, the owner of the store arrived and provided access to surveillance video of the interior of the store.  (Tr. 7–8, 12).  According to Sergeant Kittelson, the relevant footage is under one minute in length, and most activity was off camera.  (Tr. 11, 12, 13).  The video captured the suspect entering the store, a brief struggle at the cash register, and the suspect running out of the store.  (Tr. 7–8, 12, 23–24).  The video showed an adult male enter the gas station store at approximately 8:39 p.m. wearing a ski mask and carrying an open umbrella.  (Tr. 8–9, 12, 22, 23).  As the suspect entered, the umbrella obstructed his body from the waist up. (Tr. 9, 23, 24–25).  The suspect approached the store clerk brandishing what looked like a handgun and pointing it at the clerk.  (Tr. 9).  The clerk emptied the cash register contents into a black duffle bag.  (*Id.*).  Sergeant Kittelson testified that, while the robber's face and body are obstructed partially in all of the camera angles, he was able to approximate the robber's "height, weight, race, et cetera."  (Tr. 24).

---

[2]      The page references cited herein are found in the Transcript of the Motions Hearing, *United States v. Demetrius Charles Edward Derden*, (12CR12), March 1, 2012 [Doc. No. 24] ("Tr.").

Next, the video showed the clerk led the suspect to a backroom with two safes.  (Tr. 9–10, 25).  The backroom is out of the range of the surveillance cameras.[3]  (Tr. 9–10, 25).  The suspect and the clerk were not visible for approximately forty-five seconds.  (Tr. 11, 12).  Then, the suspect reappeared and ran toward the exit.  (Tr. 11, 12, 26).  He was no longer wearing a coat or a ski mask, not carrying an umbrella, and a handgun was not visible.  (Tr. 11).  Sergeant Kittelson learned that a struggle occurred between the clerk and robber in the backroom.  (Tr. 10).  Both parties were injured in the struggle and the clerk removed the robber's coat and ski mask.  (*Id.*).

Sergeant Kittelson watched the surveillance video approximately ten times, "constantly" pausing and taking notes.  (Tr. 12).  One camera angle allowed him to view a clear profile of the suspect.  (Tr. 11, 26, 27).  Once he was "confident that [he] had the exact description," Sergeant Kittelson called dispatch and updated the physical description of the robber.  (Tr. 12, 13).  At that time, he told dispatch to put out an "attempt to locate" call for the suspect.  (Tr. 12).

Next, Sergeant Kittelson collected the physical evidence from the scene, including: 1) pieces of a BB gun, 2) an umbrella, 3) loose currency, 4) a ski mask, 5) a coat believed to belong to the suspect; and 6) the coat's contents.  (Tr. 7–8, 11, 14).  The coat was a "very large, thick, down style winter coat" and had a hood with fur trim.  (Tr. 14).  Sergeant Kittelson searched the pockets of the coat and found 1) an empty bottle of Captain Morgan Spiced Rum, 2) flex cuffs, 3) a check card in the name of "Demetrius C. Derden," and 4) a weekly bank statement in the name of "Demetrius Derden."  (Tr. 11, 14, 15).  The statement showed check card activity, including withdrawals and charges.  (Tr. 15, 20).  On closer examination, Sergeant Kittelson

---

[3]     The backroom was equipped with a separate computer and video surveillance system.  (Tr. 25).  The surveillance system did not record the incident, however, because it was not operating at the time.  (Tr. 25–26).

noted that the banking activity took place "pretty consistently in the north metro." (Tr. 15, 20–21). Although the statement did not include a middle initial as the check card did, it appeared to correspond to the card. (Tr. 15, 20).

Sergeant Clark accessed the Minnesota Driver and Vehicle Services ("DVS") website and pulled up the file for "Demetrius Derden."[4] (Tr. 16). The DVS file included an address, a brief physical description, and a color photograph. (Tr. 16, 17, 18, 30). DVS described Derden as a black male with brown eyes, measuring 6'2" and weighing 185 pounds. (Tr. 17). Sergeant Clark showed the information and photograph to Sergeant Kittelson, who responded, "Wow, that's him, no doubt." (Tr. 16, 17–18, 30–31). Sergeant Kittelson and Sergeant Clark thought the DVS photograph looked "exactly" like the suspect from the surveillance video. (Tr. 16–17, 30–31).

Also, Sergeant Clark asked Sergeant Kittelson if the coat worn by Demetrius Derden in the DVS photo matched the coat recovered from the crime scene and thought to be worn by the robber in the surveillance video. (Tr. 19, 28). Sergeant Kittelson thought it appeared to be the same coat. (Tr. 28). At that point, Sergeant Kittelson was certain the Demetrius Derden described in the DVS file was the person who robbed the Mayer Mobile. (Tr. 21). Sergeant Kittelson called dispatch and changed the alert from "attempt to locate" to "probable cause, PC, pick up and hold, to stop and arrest for Carver County." (Tr. 19, 31).

---

[4]     Sergeant Kittelson referred to both Minnesota Driver and Vehicle Services ("DVS") and Department of Motor Vehicles ("DMV") in his testimony relating to the driver's license photo that appeared matching the "Demetrius Derden" inquiry. (Tr. 16, 18, 19, 27, 28, 29, 30, 31). It appears Sergeant Kittelson intended to refer to the same website. Thus, for simplicity, the Court conflates these references and consistently refers to "DVS."

Sergeant Clark then sent officers to Derden's DVS address in Minneapolis, but the attempt was unsuccessful.[5]   (Tr. 19, 29).   When he learned the DVS address failed, Sergeant Kittelson recalled the north metro bank transactions.   (Tr. 19–20).   He gave an officer a manual with the phone number of every Minnesota police department, and instructed him to start calling the north metro departments to inquire who may have information about Derden.[6]   (Tr. 20).

### B. The Officers' Entry to the Kellerman Residence and Derden's Arrest

At approximately 2:00 a.m. on December 4, 2011, dispatch announced a probable cause pick up for Demetrius Derden at 76 99th Avenue Northeast, Blaine, Minnesota 55434 (the "Kellerman home").   (Tr. 33, 44, 49).   Officers Hatanpa and Allen and Sergeant Werner of the Blaine County Police Department proceeded to the address.   (Tr. 32–33, 49).

Officer Allen recognized Derden's name and the address from a domestic disturbance call he responded to one month earlier, in November 2011.   (Tr. 33).   When Officer Allen responded to that November call, he found Derden locked out of the home.   (*Id.*).   Derden told him he lived at the address with Hannah Kellerman ("Hannah"), Hannah's children, Hannah's mother, Denise Kellerman ("Denise"), and Hannah's father.   (Tr. 33, 47).   Hannah and Denise had locked Derden out.   (Tr. 33–34).   Officer Allen spoke to Hannah and Denise and learned Denise owned the residence and Derden was Hannah's ex-boyfriend.   (Tr. 34, 79).   Hannah and Denise told the officers they wanted Derden to leave the house; they wanted to evict him.   (Tr. 41).   Hannah and Denise did not dispute that Derden paid rent.   (Tr. 42).   Officer Allen told the

---

[5]     Sergeant Kittelson was completing the processing of the interior of the scene, so he could not testify completely to the reasons the DVS address failed.   (Tr. 19).

[6]     Eventually, Sergeant Kittelson learned officers found Derden in Blaine, a northern suburb, and arrested him.   (Tr. 20, 21).   Based on Sergeant Kittelson's testimony, a dispatcher located Derden's social networking page and it established a connection to Blaine.   (Tr. 20).   Officers then contacted the Blaine Police Department to inquire about Derden.   (*Id.*).   No further testimony was offered to explain how officers located Derden.

Kellermans that Derden could not be evicted because he was paying rent; he advised them that they would have to provide sufficient notice in order to evict Derden. (Tr. 41–42). Officer Allen admitted that when he arrived at the Kellerman home to arrest Derden in December, his understanding was that Derden rented the basement area of the house and shared that space with Hannah.[7] (Tr. 47). Nothing happened the night of Derden's arrest the change Officer Allen's belief in this regard. (Tr. 34–35, 42).

On that early December morning when Officer Allen arrived at the Kellerman home, he parked his squad car down the street from the home. (Tr. 35). Officer Allen telephoned Denise and asked if Derden was in the Kellerman home. (*Id.*). He told Denise he was there to arrest Derden and asked if she would let him into her home. (Tr. 35, 43). Denise said that Derden was in the basement and she would let Officer Allen into the house. (Tr. 35). Officer Allen did not recall telling Denise to open the door as they approached the house. (Tr. 43).

As they walked toward the home, Officer Allen saw Denise waiting behind the storm door with the front door open. (Tr. 36, 43). Initially, Officer Hatanpa started for a back entrance of the residence while Sergeant Werner and Officer Allen walked to the front door. (Tr. 50). When Sergeant Werner and Officer Allen arrived at the front door, Denise opened the storm door and motioned them in, but did not say anything. (Tr. 36, 42, 43, 50). Officer Hatanpa noticed that Denise opened the front door for Officer Allen and Sergeant Warner, so he followed them into the home. (Tr. 50). Officers Allen and Hatanpa testified that neither said anything to threaten or coerce Denise; they believed she consented to their entry. (Tr. 36–37, 41, 50).

---

[7] Officer Hatanpa did not have prior information regarding whether Derden was a renter. (Tr. 55). He did not speak with Officer Allen about whether Derden was a renter or not. (*Id.*). It is not clear from the testimony whether Sergeant Werner had knowledge of Derden's status in the Kellerman home.

After entering, Officer Allen asked Denise where Derden was; she reiterated that he was in the basement. (Tr. 36, 37). Officer Allen asked her where the basement was and Denise led them through the house and pointed toward a door leading to the stairs down to the basement. (Tr. 36, 37, 43, 50–51, 55–56). She said again Derden was downstairs. (Tr. 36). She also advised the officers to be careful because children were in the basement. (*Id.*). The officers spoke to Denise in quiet voices so they would not wake anyone in the house. (Tr. 56). Officer Hatanpa admitted the police did not want to wake Derden because they wanted to arrest him in the basement where they believed he was sleeping. (Tr. 44, 56).

The basement door was open. (Tr. 37, 43–44, 51, 56). This open door was the only door between the basement and the rest of the house. (Tr. 38, 39, 52). The officers did not knock on the door, announce their presence as police officers, or request permission to enter before descending into the basement. (Tr. 38, 44, 56, 57). Officers Allen and Hatanpa's testimony conflicted about whether lights were on in the basement. (Tr. 44, 57).

When Officers Allen and Hatanpa and Sergeant Werner descended, they were in a large, open room. (Tr. 38, 51, 78). Officer Allen described the basement as a "[k]ind of living area" with a bed, couch, and TV. (Tr. 38, 46–47). Officer Hatanpa agreed the room was like a family room. (Tr. 51, 64). The bed was within ten feet of the foot of the stairs. (Tr. 51–52). Beyond the bed, officers saw boxes, clothes, and a doorway leading to another room. (Tr. 39, 51, 64–65). Access to the adjacent room required walking between the bed and the stairway. (Tr. 39, 51, 64–65). No one entered the adjacent room or knew about its contents or uses. (Tr. 39, 51, 64–65).

Hannah and Derden were sleeping in the bed and Hannah's children were sleeping on the couch.  (Tr. 38, 44, 46, 51, 52, 57).  Without requesting permission to approach, Officer Allen stood at the foot of the bed.  (Tr. 39, 45–46, 48).  Hannah was sleeping on the side of the bed closest to the stairs.  (Tr. 52).  Sergeant Werner removed Hannah from the bed while Officers Allen and Hatanpa woke Derden.  (Tr. 39, 45, 52, 57).  The officers rolled Derden onto his stomach, told him he was under arrest for robbery, and handcuffed him.  (Tr. 39, 45, 46, 52, 57).  Officers then observed Derden had a head injury consistent with the description in the updated dispatch alert for the probable cause arrest.  (Tr. 39–40, 54).  The officers searched Derden for weapons, and then led him upstairs and outside.  (Tr. 40, 52–53).  While the officers were in the basement, Hannah never told them to leave.  (Tr. 40).

In the course of conducting a "search incident to arrest," Officer Hatanpa discovered two pieces of paper in Derden's pocket and placed them in an evidence bag.  (Tr. 53–54).  Then, Officer Hatanpa assisted Derden into the squad car and took him to be booked.  (Tr. 53, 54, 55).

### C.  Issuance and Execution of Search Warrants (Gov't Exs. 1–3)

Detective Hughes of the Carver County Sheriff's Office applied for Search Warrant 1 on December 4, 2011.  (Tr. 59, 60, 61); (Gov't. Ex. 1).  In the warrant application, Detective Hughes sought authorization to search for and to seize: bank bags, check receipts, a black duffle bag, blue or grey work gloves, Holiday gift cards, BB's, $CO_2$ cartridges, light-colored blue jeans with blood residue on the left thigh, and a plain black t-shirt.  (Tr. 59); (Gov't Ex. 1 at 1).  In support of the warrant application, Detective Hughes provided a three-page affidavit detailing the robbery, the processing of the scene, and the investigation officers conducted to determine the identity of the robber.  (Tr. 60); (Gov't Ex. 1 at 1–3).

Detective Hughes presented the warrant, application, and supporting affidavit to Anoka County District Court Judge Gibbs ("Judge Gibbs"), who requested a more thorough explanation regarding the specific items listed on the warrant and Derden's connection to the residence. (Tr. 59, 60, 69). In response to the inquiries by Judge Gibbs, Detective Hughes added handwritten clarifications to the affidavit. (Tr. 60–61, 68, 69); (Gov't Ex. 1 at 2–3). In his handwritten additions, Detective Hughes explained that "[a]ccording to officers at the scene, the following items were taken: bank bags, check receipts, black duffle bag, [and] Holiday gift cards." (Gov't Ex. 1 at 2). Detective Hughes also attested that "Derden was arrested at 76 99th Ave. NE, Blaine, MN where he was sleeping. Deputies on scene also learned that Derden['s] ex-girlfriend has been staying there. The address is ex-girlfriend and she said he lives there." (Gov't Ex. 1 at 3). Judge Gibbs reviewed these additions, granted the application, and signed the warrant. (Tr. 60–61, 68, 69); (Gov't Ex. 1 at 5).

On December 4, 2011 at 8:33 a.m, officers executed Search Warrant 1, but did not seize any items. (Tr. 61, 62). Detective Hughes was present for the execution of the warrant and said the Kellermans were "very cooperative." (Tr. 63). The officers asked Hannah where they could find the items listed in the warrant and she escorted them to the basement. (Tr. 62, 63, 64, 70, 73). Hannah showed officers where Derden put his cellphone near the bed when he arrived home the night of the robbery. (Tr. 62, 70, 73). Detective Hughes admitted picking the cellphone up and photographing it, but denied searching its contents. (Tr. 70–71, 72). Rather, he turned the phone off and placed it an evidence bag. (Tr. 71, 72). Detective Hughes asked Denise and Hannah to put the phone in a safe spot so that it would not be tampered with or turned on. (Tr. 72).

Hannah also showed officers where Derden put his clothes and shoes when he got home on the night of the robbery. (Tr. 62, 70, 73). Sergeant Clark pointed the shoes out to Detective Hughes when they first arrived at the Kellerman home because he believed the shoes appeared similar to the shoes worn during the robbery. (Tr. 62). Detective Hughes identified the shoes as evidence, however, because Hannah told officers about them. (Tr. 73). Derden's shoes were placed into an evidence bag. (Tr. 62, 72, 73).

Detective Hughes denied knowledge of Derden's alleged renter status and asserted that he simply knew Derden "had been sleeping there, and he was arrested at the residence." (Tr. 72). Detective Hughes spoke briefly with Hannah and believed the basement was Hannah's room. (Tr. 63, 64, 70). "That's where she had been sleeping and that, also, [Derden] stayed there." (Tr. 63). Detective Hughes did not recall a conversation with anyone about whether the basement was rented. (Tr. 70). Detective Hughes denied that Denise or Hannah ever acted in any way suggesting that they were not consenting to police presence. (Tr. 63). Similarly, he denied Hannah acted in any way to suggest she did not consent to the police being in the basement. (Tr. 63–64).

Later that day, Detective Thiele was asked to draft a second search warrant for the Kellerman home, Search Warrant 3.[8] (Tr. 75, 82). The items listed for seizure in that warrant included those from Search Warrant 1, as well as shoes matching footprints found at the scene, Derden's cell phone, and the phone's contents. (Tr. 75); (Gov't Ex. 3 at 1). In support of the

---

[8]     Detective Hughes also obtained a search warrant for Derden's photograph and DNA, Search Warrant 2. (Tr. 65–66). Judge Kanning of Carver County signed the warrant on December 5, 2011 and it was executed on the same day. (Tr. 65–66); (Gov't Ex. 2 at 1). Derden does not seek to suppress evidence seized pursuant to this DNA warrant. (Memorandum in Support of Defendant's Pretrial Motion to Suppress the Fruit of Unlawful Arrest and Search and Seizure, "Def.'s Mem.") [Doc. No. 26 at 14].

warrant application, Detective Thiele described the robbery and subsequent investigation. (Gov't Ex. 3 at 4). Derden's arrest and the execution of Search Warrant 1 were also described. (Tr. 82); (Gov't Ex. 3 at 4). In his affidavit, Detective Thiele attested that Detective Hughes learned about the cellphone and shoes while executing Search Warrant 1. (Tr. 82–83); (Gov't Ex. 3 at 4). Detective Thiele stated that those items were not seized because they were not listed as items to be seized in Search Warrant 1. (Gov't Ex. 3 at 4).

Judge Gibbs signed Search Warrant 3 on December 4, 2011. (Tr. 75–76, 82). Detectives Thiele and Sheila Owen executed the search warrant at approximately 3:17 p.m. that same day, about thirteen hours after the arrest. (Tr. 76–77, 84). As they pulled into the driveway of the Kellerman home, they found Denise and Hannah outside. (Tr. 77). Detective Thiele told them he had a warrant for the shoes and phone. (*Id.*). He testified that Denise and Hannah "seemed to know they were coming" and had the items in bags for pick up. (*Id.*). They handed the items to Detective Thiele. (*Id.*).

Hannah also showed Detective Thiele her room and provided a statement that explained her connection to the home. (Tr. 78, 83). Detective Thiele denied that Hannah told him she did not want the police in her basement. (Tr. 78–79). Hannah told him Derden was her ex-boyfriend and the two separated about six months earlier. (Tr. 77). She allowed Derden to continue to stay in her parents' home and sleep in her bed because he had nowhere else to go and she "fe[lt] bad for him." (*Id.*). Detective Thiele denied that Hannah said whether Derden paid rent and could not recall if Hannah said she paid rent. (Tr. 77–78, 83). Denise also gave a statement to Detective Thiele. (Tr. 77, 79). Denise said Derden "was kind of going back and forth, but that he doesn't really live there. But they felt bad for him." (Tr. 79).

The Kellermans advised Detective Thiele that they maintained a curfew. (Tr. 79–80, 83). If Derden came home after curfew, the doors would be locked and he would not be allowed to gain access to the house, including the basement. (Tr. 79–80). Denise said she was awake when Derden came home past midnight the night of the robbery. (Tr. 80). Although she knew it was after curfew, Denise "let [Derden] in, she said, because it was cold out and she felt bad." (*Id.*).

## III.    DISCUSSION

Derden argues that because arresting officers entered his home (the Kellerman basement) without a warrant, his arrest was illegal under the Fourth Amendment. (Mem. in Supp. of Def.'s Pretrial Mot. to Suppress the Fruit of Unlawful Arrest and Search and Seizure, "Def.'s Mem.") [Doc. No. 26 at 5–6]. Derden's claim and burden of proving a constitutionally protected privacy interest as a renter the basement has not been challenged. Consequently, Derden has the requisite "standing" to challenge his warrantless arrest and the subsequent seizure of the evidence.

Derden contends that in that instance the proper remedy is to excise all references to his arrest from the search warrant applications. (*Id.* at 15). Without those references, he argues, the requisite nexus between the robbery and the Kellerman home is not established. (*Id.*). He therefore asserts the search warrants lack probable cause and the evidenced seized thereunder must be suppressed. (*Id.* at 14–16).

Generally, law enforcement must obtain a warrant before entering or searching a home. *See Steagald v. United States*, 451 U.S. 204, 211–12 (1981). Similarly, a warrant is required for entry into an apartment, hotel room, or room in a boarding house. *Stoner*, 376 U.S. at 487–89; *McDonald*, 335 U.S. at 454–56; *Eisler*, 567 F.2d at 816. The mere presence of probable cause to arrest someone in a home does not obviate the warrant requirement, which has only two limited

exceptions: 1) when police are faced with exigent circumstances, *see Payton*, 445 U.S. at 587–88, and 2) when consent has been given, *Bustamonte*, 412 U.S. at 220, 222; *United States v. Connor*, 127 F.3d 663, 666 (8th Cir. 1997).

The Government must prove that one of those two limited exceptions excuses the warrantless entry of the Kellerman basement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Consent is the only exception pertinent here. Because Denise had apparent authority to consent to entry of the basement, the arresting officers' entry to the basement and Derden's arrest were legal. Although the analysis on the instant motion could end there, for the sake of completeness, Derden's arguments regarding the relevant search warrants are also considered.

References to Derden's arrest offered to establish probable cause for the search warrants do not need to be removed pursuant to the exclusionary rule because his arrest was lawful. Nevertheless, assuming the references were excised as Derden wishes, probable cause supported the warrants. What is more, assuming *arguendo* the search warrants fell short of probable cause after the removal of those references, the *Leon* good-faith exception renders these searches lawful. Thus, Derden's motion to suppress should be denied.

### A. Constitutionality of the Officers' Warrantless Entry and Derden's Arrest in the Kellerman Basement

As stated previously, the Government bears the burden of establishing the validity of consent. *Bustamonte*, 412 U.S. at 222. To be valid and binding, consent must be voluntary. *United States v. Purham*, 725 F.2d 450, 455 (8th Cir. 1984) (citations omitted). "Whether the consent is truly voluntary is to be determined by the totality of the circumstances." *Id.* (quoting *Bustamonte*, 412 U.S. at 226). A warrantless search does not violate the Fourth Amendment when law enforcement officers obtain voluntary consent from the individual whose property is searched or from a third party who possesses either actual or apparent authority to consent to the

search.  *See United States v. Matlock*, 415 U.S. 164, 169–71 (1974); *Illinois v. Rodriguez*, 497 U.S. 177, 188–89 (1990); *United States v. Miller*, 152 F.3d 813, 815 (8th Cir. 1998).

Denise consented to entry of the home during her telephone conversation with Officer Allen; her subsequent gestures and holding the door open as the officers approached underscored the voluntariness of her consent.  (Tr. 35, 36, 43, 50).  She provided the arresting officers with further consent to enter the basement by guiding them through her home, pointing to the door, and motioning them downstairs.  (Tr. 36, 37, 43, 50–51, 55–56).

### 1.  Actual Authority

In order for a third party to have actual authority to give consent, the individual must possess common authority over, or a sufficient relationship to, the premises sought to be inspected.  *See Matlock*, 415 U.S. at 171; *see also United States v. Amratiel*, 622 F.3d 914, 915–16 (8th Cir. 2010).  Common authority is not implied from the property interest of a third party, but requires a third party to have mutual use of the property and joint access or control for most purposes.  *Matlock*, 415 U.S. at 171 n.7; *Amratiel*, 622 F.3d at 916.   For example, a third party may not provide valid consent to a search of another's rented space simply because they are the overseer, landlord, or property owner of the premises in question.  *Chapman*, 365 U.S. 610, 616–18 (1961); *Drummond v. United States*, 350 F.2d 983, 989 (8th Cir. 1965).  There is insufficient record evidence upon which to determine unequivocally that Denise had actual authority to consent to entry of the basement.

### 2.  Apparent Authority

Even when a third party lacks actual authority to consent to entry of shared premises, the Fourth Amendment is not violated if officers reasonably relied on the third party's apparent authority to consent.  *United States v. James*, 353 F.3d 606, 615 (8th Cir. 2003); *see Rodriguez,*

497 U.S. at 185–86.  With regard to apparent authority, the relevant inquiry is whether the facts available to the police at the time of consent, viewed objectively, justified a reasonable belief that the consenting party had authority over the premises.  *United States v. Hilliard*, 490 F.3d 635, 639 (8th Cir. 2007).

The "subtle distinctions" of property law do not control this analysis.  *Jones v. United States*, 362 U.S. 257, 266 (1960); *see Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978).  Instead, "great significance" is placed on common social expectations.  *Georgia v. Randolph*, 547 U.S. 103, 111 (2006).  The Eighth Circuit is "more liberal about allowing police to form their impressions from context" regarding apparent authority to consent.[9]  *United States v. Almeida-Perez*, 549 F.3d 1162, 1171 (8th Cir. 2008).  While further inquiry may prove their inferences incorrect, officers are entitled to draw "the usual inferences from what they see and hear."  *Id.* at 1170.  Where a third party appears to have authority over the entire premises, the police may rely on that person's consent to search the entire house, so long as the consent appears to extend that far.  *See id.* at 1172 (citing *Florida v. Jimeno*, 500 U.S. 248, 251–52 (1991)).  If part of a home is appropriated for the exclusive use of one occupant, though, other residents of the house have no right to consent to police entry of the space from which they themselves are excluded.  *Id.*

The facts available to officers at the time of Denise's consent to enter the basement support the reasonableness of their conclusion that she had authority over the premises.  First, unlike typical landlord-tenant situations, arresting officers knew Derden could not claim free access to the basement.  Entry to a rented space in a conventional landlord-tenant situation is not subject to the whim of the landlord.  *See* 4 Wayne R. LaFave, *Search and Seizure: A Treatise on*

---

[9]     Some circuits require police to "go behind appearances to verify the third party's authority."  *United States v. Almeida-Perez*, 549 F.3d 1162, 1171 (8th Cir. 2008) (citations omitted).

16

*the Fourth Amendment* § 8.5(a), 208–19 (4th ed. 2004).  While a renter has a finite interest in the

property, that interest certainly includes the right to access the property.  *See id.*   One month

prior to his arrest, Denise and Hannah locked Derden out of the home and wanted to evict him.

(Tr. 33–34, 41).  The responding officers found Derden outside in November, suggesting he had

no independent access to the basement or the home.  (Tr. 33, 34).

Second, officers found the door to the basement open.  (Tr. 37, 43–44, 51, 56).  This door

served as the only potential barrier between the basement and the Kellerman home.  (Tr. 38, 39,

52).  While the presence of a door is not determinative, it may be considered in assessing the

reasonableness of officers' conclusion regarding Denise's authority.  *See United States v. Greer*,

607 F.3d 559, 563 (8th Cir. 2010); *Mendoza*, 281 F.3d at 715–18.  If officers found the door to

the basement closed or if Deden slept in a separate basement bedroom with the door closed, it

could have been a signal of his attempt to protect his privacy or the exclusivity of his in control

of the basement.  Leaving the door open suggested a free flow of access between the basement

and the rest of the home.  Thus, the fact that officers found the basement door open supported

their belief that Denise had authority to consent to their entry of the basement.

Third, the Kellerman basement was not an area set aside for Derden's exclusive, private

use, as in traditional landlord-tenant situations.  Clearly, Hannah had equal, if not superior access

to the basement, as did the Kellerman grandchildren.  Similar to the right to free access, a tenant

conventionally enjoys the right to exclude others from their rented space.  *See* 4 LaFave § 8.5(a),

208–19.  Accordingly, a landlord's consent is effective only with respect to those portions of the

premises that clearly are not under the tenant's exclusive control.  *Id.*  Arresting officers knew he

shared the basement with Hannah.[10]   (Tr. 38, 39, 42, 45, 47).   Also, when officers arrived to

arrest Derden, Denise told them where he was sleeping and that her grandchildren were sleeping

in that vicinity.   (Tr. 36)   Her knowledge evidences some degree of access and control over the

basement, further bolstering the reasonableness of her apparent authority.

Finally, in *Almeida-Perez* the Eighth Circuit recognized that relationships between co-

occupants may give rise to the presumption that one occupant has authority to consent to entry of

the other's property.   *Almeida-Perez*, 549 F. 3d at 1172.   As an example of this presumption, the

court cited the parent-child relationship in *United States v. Wright*, 564 F.2d 785 (8th Cir. 1977).

*Id.*; *see also* LaFave § 8.4(b) (noting that the "overwhelming majority" of cases find a parent's

consent to search the room of a child valid and noting that "the essential fact that the consenting

party has the status of a parent" is a guiding principle in these cases).

The issue in *Wright* relevant here was the trial court's failure to suppress items seized in

the warrantless search of a home belonging to one defendant's mother.   *Id.* at 789–90.   The

defendant in *Wright* lived in his mother's home with her, his wife, and his child, "occasionally"

paying rent for his family's occupancy.   *Id.*   The mother consented to a search of the entire

premises and told the officers that all residents in the home had equal access to and use of all the

rooms and articles of furniture therein.   *Id.*   When officers subsequently found incriminating

---

[10]      At the hearing, officers were asked whether they sought consent to approach the "space" of the bed.  (Tr. 45, 48, 57).   The notion that co-occupants of a house or a room might nonetheless maintain certain mutually exclusive zones of privacy is a sound one and is consistent with the law in this Circuit.   *Cf.  Almeida-Perez*, 549 F.3d at 1171–72 (acknowledging that consent to entry of the bedroom of defendant posed a separate problem of consent and authority from consent to enter the house and its common areas).   Here, however, there is nothing to suggest that Derden took steps to exclude Hannah or anyone else from any area in the basement. Thus, any expectation of privacy he may have held in some undefined "space" in the basement was not objectively reasonable and he cannot claim a right to privacy therein.   *Welliver*, 976 F.2d at 1151 (citations omitted).

evidence in a dresser, she denied having access to it.  *Id.*  Citing the relationship between the defendant and his mother, as well as the mother's ownership and control of the home, the *Wright* court found her consent to be valid and rejected the defendants' claim.  *Id.*

     *Wright* informs this Court's decision.  Arresting officers knew Denise owned the home.[11] (Tr. 34).  They knew Derden was a tenant in the basement, but they also knew he shared the space with Hannah and that her children were in the basement on the night of his arrest.  While Derden did not have a parent-child relationship with Denise analogous to the *Wright* parental presumption of authority, Hannah did.  No evidence overcomes this presumption—no objective facts signaled to police that the basement had been appropriated for Hannah's exclusive use or that Denise was excluded from it.  *Almeida-Perez*, 549 F.3d at 1172.  Instead, Denise bolstered her appearance of authority and demonstrated a familiarity with the happenings in the basement when she informed arresting officers who was sleeping down there and impliedly told them to be careful because of her grandchildren.

     Although arresting officers identified Derden as a renter and knew the Kellerman's were told their right to evict him was limited because of his status, those facts are not controlling.  (Tr. 33–34, 41–42).  Based on the information available to the officers at the time of Denise's consent, it was reasonable for arresting them to conclude she had apparent authority to consent to entry of the entire premises, including the basement.  Her consent was legally effective, the officers' entry of the basement was constitutional, and Derden's arrest was legal.

---

[11]    Based on the hearing testimony, Officer Allen was the only arresting officer with actual knowledge of the November call to the Kellerman home and the information gathered on that call.  (Tr. 33).  Nevertheless, his knowledge can be imputed to all of the arresting officers.  *See United States v. Thompson*, 533 F.3d 964, 970 (8th Cir. 2008) (citing *United States v. Banks*, 514 F.3d 769, 776 (8th Cir. 2008)).

### B. Evidence Seized Under the Search Warrants

Derden challenges both search warrants, arguing that because his arrest was unlawful, all references to it must be removed from the search warrant applications pursuant to the exclusionary rule. (Def.'s Mem. at 14–16). As a result, he asserts, the applications fail to establish the requisite nexus between the robbery and Kellerman home and, therefore, the warrants fall short of probable cause. (*Id.*). Derden's arrest was lawful; therefore, any argument that the exclusionary rule operates to exclude references to that arrest is unfounded. Nevertheless, for the sake of completeness, the Court will address Derden's argument on the probable cause supporting the search warrants.[12]

Derden does not challenge the veracity of content of the information supporting the warrant applications. Rather, his argument is one of sufficiency and he submitted the search warrants for a "four corners" review.[13] The warrants are reviewed for probable cause. *See United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005). Even if the search warrants fail to establish probable cause, evidence seized will not be suppressed if the executing officers' reliance on the warrants was objectively reasonable under the *Leon* good-faith exception. *United States v. Leon*, 468 U.S. 897, 923 (1984).

---

[12]     Because the Court concludes Derden's arrest was lawful, his motion should be denied to the extent it seeks to suppress evidence discovered and seized during the search incident to his arrest. (Def.'s Mem. at 14). Assuming *arguendo* that Derden's arrest was illegal, however, the Government concedes that evidence seized in the search incident to arrest must be suppressed. (Gov't Post-Hearing Mem. in Opp'n to Def.'s Mots. to Suppress, "Gov't Mem.") [Doc. No. 25 at 14].

[13]     Derden did not make a *Franks* challenge to the warrant, submit an affidavit challenging its sufficiency, or otherwise provide pre-hearing notice to the Government or the Court that he might be seeking to advance claims that would be subject to a *Franks* analysis. *See Franks v. Delaware*, 438 U.S. 154 (1978). A *Franks* challenge requires that a defendant make a substantial preliminary showing that affidavit contents or omissions were either made with intent to make the affidavit misleading or with reckless disregard as to whether the affidavit became misleading as a result. *Id.* at 171–72.

A four-corners analysis of the warrants here, however, produces probable cause. Derden's connection to the address identified in search warrants was established well before his arrest there. Even assuming *arguendo* there was no probable cause, the *Leon* good-faith exception saves the evidence collected.

### 1.   The Search Warrants Were Supported by Probable Cause

In a four-corners analysis, the court must make a probable cause determination based only on information found within the four corners of the affidavit supporting the warrant. *Solomon*, 432 F.3d at 827. "If an affidavit in support of a search warrant sets forth sufficient facts to lead a prudent person to believe that there is a fair probability that contraband or evidence of a crime will be found in a particular place, probable cause to issue the warrant has been established." *Id.* (citations omitted); *see Illinois v. Gates*, 462 U.S. 213, 238 (1983). "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *United States v. Gallegos*, 430 F. Supp. 2d 915, 928 (D. Minn. 2006) (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978)). The affidavit and application must also establish a nexus between the items to be seized and criminal behavior. *Warden v. Hayden*, 387 U.S. 294, 306-07 (1967); *United States v. Williams*, 623 F.2d 535, 536 (8th Cir. 1980). A court "may properly rely on normal inferences drawn by the surrounding circumstances and the allegations of facts contained in the affidavit." *United States v. Carlson*, 697 F.2d 231, 238 (8th Cir. 1983); *see United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000). Likewise, officers may make reasonable inferences when preparing affidavits in support of a warrant. *Thompson*, 210 F.3d at 860. The search warrants are reviewed to ensure the issuing judges had a "substantial basis" for concluding that probable

CASE 0:12-cr-00012-PJS-SER   Document 36   Filed 04/16/12   Page 22 of 25

cause existed. *United States v. LaMorie*, 100 F.3d 547, 552 (8th Cir. 1996). An issuing judge's determination is owed substantial deference. *Id.* The Court considers the warrants separately.

In his supporting affidavit for application of Search Warrant 1, Detective Hughes attested to specific, articulable facts regarding the robbery, the processing of the scene, the identification of Derden as the suspect, the Blaine Police Department's familiarity with Derden, and Derden's arrest at the Kellerman address. (Gov't Ex. 1 at 2–3). The application submitted by Detective Thiele for Search Warrant 2 also contained sufficient evidence for the judge to conclude that evidence of the robbery would be found at the Kellerman home. (Gov't Ex. 3 at 6). In his supporting affidavit, Detective Thiele reiterated the information found in the affidavit supporting application for Search Warrant 1, as well as an explanation of the execution of that search warrant and the discovery of cash believed to be linked to the robbery. (Gov't Ex. 3 at 3–5). In addition, both warrants sought specific evidence related to the crime for which Derden was arrested. (Gov't Ex. 1 at 1; Gov't Ex. 3 at 1). Both affidavits contain only minimal references to Derden's arrest.[14] (Gov't Ex. 1 at 2–3; Gov't Ex. 3 at 3). Additionally, neither affidavit contains any new information gathered during the allegedly illegal arrest.

---

[14]     The affidavit in support of the first search warrant states: "Patrol issued a KOPS alert to metro agencies with Derden's name and physical description. The Carver County Sheriff's Office was contacted by Blaine Police Department, who advised they were familiar with Derden and knew where he would be living. Blaine Police Department responded to Derden's residence and placed him under arrest. . . . Your affiant also learned Derden was arrested at 76 99th Ave. NE, Blaine, MN where he was sleeping. Deputies on scene also learned that Derden ex-girlfriend has been staying there. The address is also ex-girlfriend. And she said he lives there." (Gov't Ex. 1 at 2–3). The affidavit in support of the second search warrant stated: "Patrol issued a KOPS alert to metro agencies with Derden's name and physical description. The Carver County Sheriff's Office was contacted by Blaine Police Department, who advised they were familiar with Derden and knew where he would be living. Blaine Police Department responded to Derden's residence and placed him under arrest." (Gov't Ex. 3 at 3).

22

Even if references relating to Derden's arrest are excised from the affidavit, the remaining information establishes the requisite nexus between the robbery and the Kellerman's address.  In November, he told officers that he lived in the Kellerman home.  (Tr. 34).   The affidavits reflect arresting officers' knowledge of Derden's residence at the address prior to his arrest: "The Carver County Sheriff's Office was contacted by Blaine Police Department, who advised they were they were familiar with Derden and knew where he would be living."  (Gov't Ex. 1 at 2; Gov't Ex. 3 at 3).  The sole reason officers were able to locate and arrest Derden was that they knew where he lived.

Derden cites *United States v. Madrid*, 152 F.3d 1034, 1040 (8th Cir. 1998), in support of the proposition that in evaluating probable cause to support the search warrants, the Court should strike references to Derden's purportedly unlawful arrest from the warrant application and accompanying affidavits.  (Def.'s Mem. at 14–15).  *Madrid* is inapposite.  First, the facts in this case are distinguishable from those of *Madrid*, where the warrant application and affidavit referenced the fruits of an unlawful search that was conducted without actual or apparent authority.  *Madrid*, 152 F.3d at 1039–40.  Second, even if the Court excised references to Derden's arrest, probable cause supporting the warrants still existed.  *Id*. at 1040.

### 2.   The *Leon* "Good Faith" Exception Applies

Even if probable cause does not support a search warrant, a suppression motion may be denied if the *Leon* good-faith exception applies.  In those circumstances, "evidence seized pursuant to a search warrant. . . that is later determined to be invalid, will not be suppressed if the executing officer's reliance upon the warrant was objectively reasonable." *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007); *United States v. Ross*, 487 F.3d 1120, 1122 (8th Cir. 2007) (citing *Leon*, 468 U.S. at 923)). The *Leon* good-faith exception is lost, however, when an

officer relies on a warrant for which the supporting affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Ross*, 487 F.3d at 1122 (quoting *Leon*, 468 U.S.at 923 (citations omitted)).

Here, the officers' conduct substantiates a finding of good faith and an attempt to protect Derden's constitutional rights.  The officers obtained three warrants in twenty-four hours. (Gov't Exs. 1–3).  Despite the opportunity to seize the shoes and cellphone during the execution of the first warrant pursuant to the plain view doctrine, officers obtained another search warrant specifically for those items.  *United States v. Chipps*, 410 F.3d 438, 442 (8th Cir. 2005) (finding that law enforcement officers do not violate the Fourth Amendment when they seize items pursuant to the plain view doctrine).

No evidence suggests that the officers' reliance on the warrants was not in good faith, or that their reliance was unreasonable.  As detailed above, both affidavits contained specific, articulable facts regarding the robbery, the subsequent investigation resulting in Derden's identification, and the evidence expected to be recovered.  Officers acknowledged that when they executed the search warrants at the Kellerman home they relied "in good faith" on "valid search warrant[s]."  (Tr. 61, 76).  The executing officers recognized that they did not have "any reason to doubt the validity of the search warrant[s]."  (*Id.*).  Finally, nothing suggests that the information provided in the affidavits intentionally or recklessly misled the issuing judges.  In fact, at the request of Judge Gibbs, Detective Hughes handwrote additional information on the first search warrant application to satisfy his inquiries.  (Tr. 60–61); (Gov't Ex. 1 at 2–3). Removing all references to Derden's arrest from the affidavits does not cause the search warrants

to be "so lacking in indicia of probable cause" as to make it "entirely unreasonable" for officers

to rely on the warrants.  *Ross*, 487 F.3d at 1122 (quoting *Leon*, 468 U.S. at 923).[15]

## IV.     RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that Defendant's Pretrial Motion to Suppress the Fruit of Unlawful Arrest

and Search and Seizure [Doc. No. 17] be **DENIED**.

Dated: April 16, 2012

*s/ Steven E. Rau*
STEVEN E. RAU
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **April 30, 2012**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.

---

[15]     In an abundance of caution, the Government asserts that if Derden's arrest was illegal, it was sufficiently attenuated from the seizure of evidence so that the exclusionary rule should not apply.  (Gov't Post-Hearing Mem. in Opp'n to Def.'s Mots. to Suppress, "Gov't Mem.") [Doc. No. 25 at 13–19].  The challenged evidence in this case was subject to two search warrants.  (Tr. 59–62, 75–77); (Gov't Exs. 1, 3).  Even assuming these search warrants were not supported by probable cause, as detailed above, *Leon* applies to except their execution and any evidence seized under them from the exclusionary rule.  Reliance on the attenuation doctrine in this case is simply unnecessary.